**TEMPLETON COAL COMPANY, INC., Sherwood–Templeton Coal Company, Inc., Princeton Mining Company, and Berwind Corporation, Plaintiffs,**

v.

**Donna E. SHALALA, Secretary, United States Department of Health and Human Services, United Mine Workers of America Combined Benefit Fund and its Trustees, Marty D. Hudson, Michael Holland, Elliot A. Segal, Thomas O.S. Rand, Carlton R. Sickles, Gail R. Willensky, and William P. Hobgood, Defendants.**

**No. TH 93–158–C.**

United States District Court, S.D. Indiana, Terre Haute Division.

Nov. 18, 1993.

**994**

David H. Goeller, Wilkinson Goeller Modesitt Wilkinson & Drummy, Terre Haute, IN, Rosemary M. Collyer, J. Michael Klise, Michael A. Bazany, Jr., Crowell & Moring, Washington, DC, for Templeton Coal Co., Inc., Sherwood–Templeton Coal Co., Princeton Min. Co., Inc., and Berwind Corp.

Jill E. Zengler, Indianapolis, IN, Gretchen E. Jacobs, Federal Programs Branch, Dept. of Justice, Washington, DC, for Donna E. Shalala, Secretary.

John R. Mooney, Beins Axelrod Osborne Mooney & Greene, PC, Peter Buscemi, Morgan Lewis & Bockius, Washington, DC, Edward J. Fillenwarth Jr., Fillenwarth Dennerline Groth & Baird, Indianapolis, IN, for United Mine Workers of America, Marty D. Hudson, Michael Holland, Elliot A. Segal, Thomas O.S. Rand, Carlton R. Sickles, Gail R. Willensky, and William P. Hobgood, trustees.

David W. Allen, Office of Gen. Counsel, UMWA Health and Retirement Funds, Washington, DC.

### ENTRY FOLLOWING ARGUMENT ON REQUEST FOR PRELIMINARY INJUNCTION

TINDER, District Judge.

This suit involves a challenge to the constitutionality of a recently enacted piece of federal legislation affecting the funding of health care benefits for retirees of the coal industry. The suit is timely in the sense that in very recent days, Americans have undertaken a major public debate of health care costs and funding in this country. The challenged statutory scheme is one method of allocating health insurance costs for one significant segment of the work force. The outcome of this suit will have no direct bearing on the focus of that debate. Nonetheless, the suit reflects the types of dilemmas posed by efforts to address these difficult issues facing workers and their dependents, employers, and the nation's lawmakers.

However, in another real sense, the suit is untimely. The Plaintiffs have been aware of their potential obligations under the legislative scheme since at least June of this year, and most likely had substantial information about the issues brought before the court in this suit well before that. Nonetheless, the Plaintiffs waited until September 2, 1993 to file this suit, less than thirty days before the threatened actions complained of were scheduled to begin, thus leaving little time for the Defendants to make a fair response to the Plaintiffs' requests for emergency injunctive relief, and an unsuitably short period of time for the court to consider the complex issues presented by the suit. Under the circumstances, the parties have done a remarkably good job of compiling documents and well written briefs for the court's consideration. The court heard oral arguments on September 30, 1993 at which counsel did an admirable job of elaborating their positions.[1]

### I. FINDINGS OF FACT [2]

The statutory scheme in question and the historical events leading up to its congressional enactment were ably described by

---

1. The suit was filed while the assigned judge, the Honorable Larry J. McKinney, was presiding over an extended patent trial which was expected to last at least a month beyond the starting date of the claimed constitutional violations. Thus, I assumed responsibility for ruling on the request for preliminary injunctive relief. Because I have become familiar with the legal and factual issues in this case, I will retain responsibility for it, and the Clerk will be directed to make a transfer of case assignment. There is no point in duplicating the judicial preparation that has gone into the case thus far.

2. This entry addresses only the request for a preliminary injunction. The "findings" denominated here are only determined for purposes of this preliminary matter pursuant to the requirements of Fed.R.Civ.P. 51(a) and are based only on the affidavits, exhibits, and other documents

Judge Graham in *Barrick Gold Exploration, Inc. v. Hudson,* 823 F.Supp. 1395 (S.D.Ohio 1993) and there is no point in reiterating his fine discussion. Accordingly, this court adopts the discussion by Judge Graham at pages 1398 through 1401 and supplements it with the following facts to the limited extent that the parties in this case present a slightly different factual scenario.

The Plaintiffs in this suit are four companies that were previously involved in the coal mining business. They each were signatories to collective bargaining agreements with the United Mine Workers of America ("UMWA") in the 1950s and 1960s.[3] Specifically, Templeton Coal Company, Inc. ("Templeton"), Sherwood–Templeton Coal Company, Inc. ("Sherwood"), and Princeton Mining Company, Inc. ("Princeton") bargained with the UMWA through the Indiana Coal Operators' Association ("ICOA"), an independent multiemployer bargaining association. Berwind Corporation ("Berwind") (formerly known as Berwind–White Coal Mining Company) bargained with the UMWA through the Central Pennsylvania Coal Producers' Association ("CPCPA"). The Bituminous Coal Operators' Association ("BCOA"), a multiemployer bargaining association, was formed by many of the UMWA coal mine operators and became the primary negotiator with the UMWA after 1951. Berwind was a member of BCOA between 1955 and 1962. The other three Plaintiffs were never BCOA members, but shadowed the BCOA's activities by membership in ICOA, a similar multiemployer bargaining association.

All four Plaintiffs were signatories to the 1950 National Bituminous Coal Wage Agreement ("NBCWA") and subsequent amendments thereto in 1951 and 1952. The NBCWA was also amended in 1955, 1956, 1958, 1964, and 1966, but the Plaintiffs' connections to those agreements after 1952 varied. Templeton ceased mining operations prior to the 1955 Amendment and consequently was not a signatory to it or any subsequent amendments to the NBCWA. Sherwood and Berwind were signatories to the 1955, 1956, and 1958 Amendments. Sherwood ceased mining operations with UMWA miners in 1960. Berwind ceased coal mining altogether in 1962. Thus, Sherwood and Berwind did not sign the 1964 or 1966 Amendments or any subsequent NBCWA. Princeton signed all the amendments through 1964, but ceased mining before the 1966 Amendment and did not sign any subsequent NBCWAs.

As discussed by Judge Graham in *Barrick Gold Exploration,* the enactment of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776, 3036–3056 ("the 1992 Coal Act" or "the Coal Act"), occurred in October of 1992, and it was subsequently codified at 26 U.S.C. § 9701 et seq., as part of the Energy Policy Act of 1992. The Coal Act substantially affects the Plaintiffs, and they seek an injunction against its enforcement against them and a judgment that it violates the Due Process and Takings Clauses of the United States Constitution as applied to them.

The 1950 NBCWA established the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 W & R Fund"). According to undisputed affidavits submitted by the Plaintiffs, when each of them ceased mining coal with UMWA-represented employees, they had fully complied with their

submitted in an expedited manner in connection with the argument on the request for a preliminary injunction. Obviously, the court's views on these evidentiary matters are not binding at trial. A matter on which the court currently makes a finding may be determined differently after a full explication of evidence at trial.

3. The Defendants present evidence regarding the federal government's involvement in health and benefit matters within the coal industry dating even further back into the 1940s, principally through submission of *Financing UMWA Coal Miner "Orphan Retiree" Health Benefits* 100–101 (Comm.Print 1993) [*"Funding UMWA Orphan*

*Retirees"*] (Staff of House Comm. on Ways and Means, 103d Cong., 1st Sess.); *Coal Commission Report: A Report to the Secretary of Labor and the American People* 16–18 (Nov. 1990) [*"Coal Commission Report"*]. All of this appears to be a genuine historical discussion of labor and governmental relations in the coal industry and it is somewhat relevant that Congress had these reports available when it acted on this legislation. However, this court is able to evaluate the preliminary injunction questions without going beyond the first agreement signed by these Plaintiffs.

obligations to contribute to the 1950 W & R Fund. The 1950 W & R Fund was created as an irrevocable trust under Section 302(c) of the Labor–Management Relations Act of 1947. According to the 1950 NBCWA, the 1950 W & R Fund was to provide "benefits to employees of said Operators, their families and dependents for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness … [and] benefits on account of sickness, temporary disability, permanent disability, death or retirement." 1950 NBCWA at 136. Sole discretion regarding the scope and duration of the benefits that employees might receive as a result of the 1950 W & R Fund belonged to the trustees of the 1950 W & R Fund. The principal obligation of the mine operator signatories to the 1950 NBCWA, including the Plaintiffs, was to contribute into the 1950 W & R Fund thirty cents per ton of coal mined. The duration of this obligation continued for the life of the agreement.

None of the amendments to the NBCWA in 1951, 1952, 1955, 1956, 1958, or 1964 changed the terms regarding providing health benefits to retirees under the 1950 NBCWA except that the 1952 Amendment increased the per-ton contribution to forty cents, which carried over to the succeeding agreements. The 1964 Amendment added a requirement that eighty cents per ton be contributed for coal purchased from non-UMWA operators.

Essentially, subsequent NBCWAs through 1974 maintained the general elements of the 1950 W & R Fund as the exclusive provider of health and other welfare benefits for both active and retired UMWA miners and their dependents. The first significant change occurred in the 1971 NBCWA when the trustees were directed to extend benefits at levels set by the BCOA and the UMWA, rather than at levels determined by the trustees as was previously done. Substantially more radical changes developed as a result of the 1974 NBCWA. That agreement converted the 1950 W & R Fund into an entity known as the UMWA 1950 Pension Trust. The 1974 NBCWA also created two other plans relevant to this proceeding:[4] the UMWA 1950 Benefit Plan and Trust ("1950 Benefit Fund") and the UMWA 1974 Benefit Plan and Trust ("1974 Benefit Fund"). These Benefit Funds provided health and other non-pension benefits to covered miners who retired before January 1, 1976 (1950 Benefit Fund) or after January 1, 1976 (1974 Benefit Fund). The assets of the 1950 W & R Fund were transferred to the UMWA 1950 Pension Trust so that both Benefit Funds started with a zero funding base. The funding for the two new Benefit Funds was to come from BCOA members and other signatories to the 1974 NBCWA. However, perhaps the most revolutionary change brought by the 1974 NBCWA was the explicit promise that a covered retired miner would retain health benefits for life. The class of beneficiaries entitled to benefits also was expanded to include all surviving spouses of UMWA retirees, rather than just widows of miners killed in mines as was previously the case.

The next NBCWA—the 1978 version—brought about still more changes in UMWA retiree health benefits. As a result of the 1978 NBCWA, the source of benefits for UMWA miners who retired before January 1, 1976 was unchanged—the 1950 Benefit Fund. Miners who retired on or after January 1, 1976 would receive benefits from individual plans established and financed by the signatories to the 1978 NBCWA. The 1974 Benefit Fund was relegated to being used to provide benefits to miners who retired on or after January 1, 1976 and who were "orphaned" because their operators were no longer in business. The 1978 NBCWA also contained what has become known as the "guarantee clause," subsequently interpreted to obligate signatory mine operators (and signatories to all subsequent NBCWAs) to make sufficient contributions to insure payment of the benefits that had been promised for life in the 1974 NBCWA.[5]

---

4. The 1974 NBCWA also created a third plan, namely, the UMWA 1974 Pension Trust. However, that trust has no bearing on this suit.

5. The relevant portion of that clause reads:

**Guarantee of 1950 Plans and Trusts and 1974 Plans and Trusts**

Notwithstanding any other provisions in this Agreement the Employers hereby agree to fully guarantee the pension and health benefits pro-

The Plans for both the 1950 and 1974 Benefit Funds were modified to add what has become known as the "evergreen" clause, requiring continuing contributions in connection with the 1978 NBCWA.[6]

The next NBCWA—in 1988—added withdrawal liability for signatories to that agreement. That liability provision required employers withdrawing from the Benefit Funds to pay an actuarially determined amount to cover the future costs of retirees left uncovered by the withdrawal.

During the late 1970s and 1980s, the adequacy of funding for the Benefit Funds came into question. A number of large coal operators who had signed the 1978 and subsequent NBCWAs began terminating their participation in the Benefit Funds. This put a great demand on the 1974 Benefit Fund because the retirees of these non-participating operators drew their benefits from the 1974 Benefit Fund in growing amounts. The remaining employers had to pay drastically increasing contributions to keep the Benefit Fund afloat. The financial burden to remaining NBCWA signatories became an ever increasing incentive to withdraw from the Benefit Fund.

During the same era, the cost of health care continued to rise. This was accompanied by a substantial decrease in the amount of coal being produced by NBCWA operations. Almost simultaneously, large numbers of miners hit retirement age while the number of mine operators dwindled. The Plaintiffs submit that fraud and mismanagement also plagued the Benefit Fund. No matter what the cause, a true crisis point was reached in the funding of coal-industry retiree health benefits by the beginning of the 1990s. The controversy was most dramatically demonstrated in the protracted strike against the Pittson Coal Company and related entities. Following the settlement of that strike, the Secretary of Labor, Elizabeth Dole, formed the Coal Commission (formally denominated as the Advisory Commission on United Mine Workers of America Retiree Health Benefits) to examine and report on this problem. The resultant written Coal Commission Report is in the record of the preliminary injunction proceedings. As might be expected, the Commission was in substantial agreement in identifying the rising cost of paying for the "orphan" retirees as the principal cause of the mine workers health-care funding crisis. In fact, it was projected that the 1950 and 1974 Benefit Funds would accumulate a combined deficit of $300 million by the end of 1993 if no action was taken. However, there was a divergence of opinion on when retiree health-care benefits had become an obligation of mine operators and on how to finance the retiree health benefits. The Report was made available to Congress and it supplemented other information gathered in connection with hearings held in the United States Senate on this problem. The debate on this subject continued in Congress. In substantial part, the 1992 Coal Act was designed to ameliorate the coal industry retiree health care funding predicament.

Only one of the three funding mechanisms created by the 1992 Coal Act is at issue in this case, specifically the UMWA Combined Benefit Fund ("Combined Fund"). 1992 Coal Act §§ 9702, 9711, 9712. The Combined Fund is a statutory merger of the 1950 Benefit Fund and the 1974 Benefit Fund.

---

vided by the 1950 Pension Fund, the 1950 Benefit Fund, the 1974 Pension Fund, the 1974 Benefit Fund and all other benefit plans described in Section (c) of this Article XX during the term of this Agreement.

In order to fully fund these guaranteed benefits, the BCOA may increase, not decrease, the rate of contributions to be made. . . . These contributions, which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement.

**6.** The so-called "evergreen" clause provides that:

Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the (1950/1974) Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the (1950/1974) Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the (1950/1974) Benefit Trust, as amended from time to time, including, but not limited to making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto.

*Id.* § 9702(a)(2). $70 million was transferred into the Combined Fund from the 1950 Pension Trust on February 1, 1993. The Pension Trust will transfer an additional $70 million into the Combined Fund at the beginning of each of the next two fiscal years. Beginning on October 1, 1995, the Abandoned Mine Reclamation Fund will transfer as much as $70 million or more to the Combined Fund and will continue to do so for each year through 2003. These transferred funds are to be used to reduce the amounts contributing employers would otherwise be required to pay to the Combined Fund. The Combined Fund is also authorized to be subsidized by health insurance premiums and death benefit premiums paid by each "assigned operator." *Id.* §§ 9704, 9705. An "assigned operator" under the 1992 Coal Act is a signatory to *any* NBCWA since 1950. *Id.* § 9701(c)(5). Liability is to be "assigned" by the Secretary according to the beneficiaries' degree of prior employment with a signatory to any NBCWA since 1950. *Id.* § 9706(a), (b)(1). The Secretary also is required to assess a proportionate premium to each assigned operator to pay for the costs of health benefits for "unassigned beneficiaries"—the "orphans," that is, the retirees (and surviving spouses and dependents of retirees) of employers who no longer are in business of any kind. *Id.* § 9704(d), (f). The level of benefits provided under the 1988 NBCWA will be maintained. *Id.* § 9703(b). Premiums must be paid every year while all beneficiaries remain living. *Id.* § 9704.

The signatories to the 1988 NBCWA are obligated to pay the "start-up" costs of the Combined Fund for the period February 1, 1993 to September 30, 1993, but thereafter each "assigned operator" will be charged a share of these costs and the signatories to the 1988 NBCWA will get an offset for their start-up contributions against future funding obligations. *Id.* § 9704(g), (i)(3).

The apparent purpose of the 1992 Coal Act is to provide funds for UMWA retiree health care benefits through the private sector. The Plaintiffs emphasize that the Coal Act is premised on the specific legislative finding that:

> [T]o secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

Energy Policy Act § 19142(a)(2).

As a result of the Coal Act, every coal operator (present and former) that signed any NBCWA from 1950 through 1988 and that is still in existence in any form is obligated to contribute to the new statutory benefit fund. 1992 Coal Act § 9701(c)(5).

It appears that the Secretary has, at least for the most part, completed the assignment process and has designated "assigned" and "unassigned" beneficiaries as required by the Coal Act. As a result, most of the Plaintiffs have been notified that they are responsible for paying insurance premiums for a certain number of former employees—including surviving spouses and dependents—("assigned beneficiaries") and a number of "orphans" ("unassigned beneficiaries").[7] Templeton was assigned 52 beneficiaries, Princeton 196, and Berwind 1,269.[8] These are substantially larger numbers than the Plaintiffs had expected as of the filing of this suit, and the Plaintiffs contend that the assignments are not accurate.

The Coal Act provides a method for administrative relief from incorrect assignments and that issue is not before the court on this preliminary injunction matter. However, the assigned premiums must be paid even during an administrative challenge of the assignment. A penalty of $100 per day, per beneficiary, for unpaid assignments faces the Plaintiffs. *Id.* § 9707(b). Obviously, these assignments will decrease over the years as

---

7. It does not appear that a premium payment will be required for the unassigned orphans at the present time. The transfer of funds from the 1950 Pension Fund appears to have covered the orphans' premiums for the first year of this program.

8. The court has not been informed of Sherwood's assignments.

beneficiaries die, but the Secretary estimates present expense per beneficiary to be somewhere between $2000 and $2300. The Plaintiffs argue that the liability for some beneficiaries could continue for up to thirty years. The initial payments were to be submitted to the Combined Fund by October 25, 1993. *Id.* § 9704(g).

It is this so-called "reachback" liability imposed by § 9704 of the Coal Act that is challenged in this suit. The Plaintiffs contend that none of the NBCWAs they signed obligated them to make any retiree health insurance benefits after their participation in the coal mining business terminated. They build on their argument by pointing out that all of the provisions of post–1964 NBCWAs that Congress believed to be the basis for imposing "reachback liability"—the lifetime duration, the guarantee clause, the evergreen provisions, and withdrawal liability—all were instituted in agreements entered after they left the industry. Their position is simple— they didn't agree to this liability, and Congress can't (constitutionally) make them responsible for it. However, even after the Plaintiffs stopped contributing to the 1950 W & R Fund, their retired employees and subsequently retiring persons who had worked for the Plaintiffs at various times continued to receive benefits from the Benefit Fund. In effect, this resulted in a shift of the responsibility for financing health benefits for the Plaintiffs' former employees to the coal mine operators who continued to participate in the Benefit Fund. There is a strong indication that Congress assumed that all signatories to NBCWAs since 1950 had committed lifetime health benefits to UMWA retirees without qualification.[9]

The Defendants need little introduction. Defendant Shalala is here by virtue of the duties required of her by the Coal Act. The intervening Defendants, the United Mine Workers of America Combined Fund and its Trustees, Marty D. Hudson, Michael H. Holland, Elliot A. Segal, Thomas O.S. Rand, Carlton R. Sickles, Gail R. Willensky, and Michael Hobgood, are parties because I have determined them to be necessary to this litigation: they are charged with the responsibility of collecting and receiving the insurance premiums in question and with administering the health benefits in question. The Defendants are familiar litigants on the questions involved here because they were also defendants in *Barrick Gold* before Judge Graham and most likely are parties in the other suits involving the Coal Act presently pending in various federal courts.

## II. *CONCLUSIONS OF LAW*[10]

The Defendants do not dispute the financial impact of the Coal Act asserted by the Plaintiffs, except that the Defendants point out that transferring funds from the Combined Funds will defer, if not complete, the Plaintiffs' payment obligations as to the "orphans." Nonetheless, no significant challenge is raised to the Plaintiffs' standing to bring this suit or the jurisdiction of this court to consider it. The matter is clearly ripe for adjudication because the assignments and assessments have been made and the premiums are now due.

The parties are also in general agreement with the historical background described by Judge Graham in *Barrick Gold*, although they may dispute whether the current state

9. The Plaintiffs have pointed to multiple comments by Senators which suggest such an assumption. *See, e.g.,* 138 Cong.Rec. S10,784 (daily ed. July 29, 1992) (statement of Sen. Byrd) ("[t]his amendment ... says that when promises are made, promises will be kept"); *id.* at S10,785 (statement of Sen. Byrd) (Act's goal is "to protect the retirees who were promised lifetime benefits"); *id.* at S10,786 (statement of Sen. Wofford) ("retired miners are entitled to the health care benefits they were promised").

10. Most significant of all of the court's conclusions is the ultimate conclusion that a preliminary injunction should not be granted. This surely will come as a surprise to the parties since

the court issued a preliminary injunction on October 25, 1993—albeit without the necessary reasons and findings required by Rules 52 and 65(d) of the Federal Rules of Civil Procedure. However, while preparing this entry, the court continued to carefully consider the issues involved and has *sua sponte* reconsidered the issuance of the injunction. When originally issuing the injunction, the court was reading the Due Process and Takings cases too narrowly. The court will issue a separate order dissolving the injunction within a short time to allow the Plaintiffs to make the payment arrangements required without undue interruption.

of underfunding of the miners' welfare benefits results from fraud and mismanagement or increasing costs combined with a diminution in the number of contributors to the Benefit Funds. They are in substantial agreement as to the preliminary injunction standards to be applied by a district court sitting in this circuit—except that, of course, they reach drastically different results in the application of those standards. Nonetheless, an extended discussion of the oft-cited relevant standards is unnecessary. The appropriate formulation for the review of a request for a preliminary injunction has been stated clearly by the Seventh Circuit Court of Appeals in countless decisions. This court's application of that standard in the context of a constitutional challenge to a statutory enactment has also been discussed at length in a prior opinion, so reiteration of that formula is needless. *See Government Suppliers Consolidating Servs., Inc. v. Bayh,* 734 F.Supp. 853 at 862 (S.D.Ind.1990). As will be indicated below, the preliminary injunction question is decided by a consideration of whether Plaintiffs have shown a reasonable likelihood of prevailing on the merits.

Without further adieu, the heart of this dispute can be reached quickly. The Plaintiffs want the portion of the Coal Act that would require them to pay health insurance premiums for their former employees and the "orphans" declared unconstitutional. They base their challenge on both the Due Process and Takings Clauses of the United States Constitution. Their challenge is slightly different than the one raised in *Barrick Gold.* The plaintiffs in *Barrick Gold* were also former coal mine operators who had terminated their coal mine operations *after* becoming signatories to the 1988 NBCWA. The Plaintiffs in this case, by contrast, have not signed an NBCWA in the last thirty to forty years. A lot has happened, they argue, in those three to four decades to materially alter the NBCWAs subsequently entered—specifically, the development of the 1974 Benefit Fund and the adoption of the guarantee and evergreen clauses and the contractual withdrawal-liability provision. They contend that their liability to former employees terminated when their employment of miners under the NBCWAs to which they were signatories ended. They argue that the Constitution precludes assessment of current liability against them because they did not agree to such exposure in the contracts they entered. The Plaintiffs' constitutional challenge is clearly an attack on § 9704 only, and only to the extent "as applied" to them, rather than a facial challenge to the constitutionality of the entire statutory scheme.

## A) *LIKELIHOOD OF SUCCESS ON THE MERITS*

### 1.) *DUE PROCESS*

Of course, the challenged provision begins with a strong presumption of constitutionality. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). The burden is on the Plaintiffs in bringing their complaint alleging a due process violation to establish that Congress acted in an arbitrary and irrational way in connection with economic legislation. *See, e.g., id.* at 15, 96 S.Ct. 2892; *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–488, 75 S.Ct. 461, 464–465, 99 L.Ed. 563 (1955). Great deference is paid to the legislative decisions of Congress. The Plaintiffs' due process of law challenge can prevail only if they show the questioned statute to be arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt. *Nebbia v. New York,* 291 U.S. 502, 539, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934). The statute will stand if a rational relationship exists between it and a legitimate governmental objective. *Id.* at 537, 54 S.Ct. at 516.

Thus, the broad extent of congressional power is limited only by the constraints of a rational relationship between the enactment and an appropriate goal of government. The legislative will can wander broad prairies. Given the low level of scrutiny applied to federal legislation allocating the burdens and benefits of economic life, it is not surprising that virtually every substantive due process challenge to economic legislation has failed since *Railroad Retirement Bd. v. Alton R.R. Co.,* 295 U.S. 330, 354, 55

S.Ct. 758, 764, 79 L.Ed. 1468 (1935), and the vitality of *Alton* has been, to put it mildly, severely questioned. *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). The string of unsuccessful challenges to economic legislation seems endless. *See, e.g., Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Pension Ben. Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Some even speculate that economic regulations can never be found to be irrational. *Central States Pension Fund v. Lady Baltimore Foods, Inc.,* 960 F.2d 1339, 1343 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992). So why should this case be different? Have these Plaintiffs shown that their claim clears the seemingly insurmountable hurdles of irrationality and arbitrariness? The Plaintiffs focus on several aspects of the Coal Act to distinguish this case from the hordes of other failed endeavors.

First, the Plaintiffs frame their argument as though the Coal Act is retroactive legislation as applied to them. Simply put, they contend that their sole commitment to funding health benefits was a fixed per-ton contribution and the last ton giving rise to such an obligation was mined decades ago. Analogizing to the subsequently created pensions in *Alton,* the Plaintiffs contend that the retiree health benefits are the supplementation of an earlier wage already paid to the retirees. If the legislation is retroactive, a greater justification will be required in a due process test. *Turner Elkhorn,* 428 U.S. at 17, 96 S.Ct. at 2893.

However, the conclusion that the Coal Act is retroactive is not so easily reached. Certainly, the Plaintiffs are assessed liability for retiree health benefits because of their prior coal mining activity under NBCWAs. The utilization of previously existing facts to regulate subsequent action is not necessarily retroactive legislation. *Reynolds v. United States,* 292 U.S. 443, 449,

54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934). As the Intervening Defendants noted, when a statute merely relates to current and future conditions and neither punishes past wrongdoing nor imposes liability for past acts, the statute simply is not retroactive. *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984, 996 (D.S.C. 1984), *aff'd in part, vacated and remanded on other grounds sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). In other words, liability imposed for present and future conditions arising out of past conduct is not *per se* retroactive. *United States v. Northeastern Pharm. & Chemical Co.,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). The assessment of retiree health insurance liability because of prior employment of miners is more correctly analogized to the imposition of liability for correcting existing environmental problems based on prior conduct than to the requirement of an increase of benefits for work previously performed. However, retroactivity alone would not doom the Coal Act under the Due Process Clause. *Turner Elkhorn,* 428 U.S. at 16, 96 S.Ct. at 2892. Retroactive application of an economic burden can still be based on a rational legislative purpose. *R.A. Gray,* 467 U.S. at 717, 104 S.Ct. at 2709.

Next, the Plaintiffs argue strenuously that the agreements they signed contained nothing more than defined contribution requirements, setting a per-ton amount to be paid into a welfare plan for a finite period of time, specifically, for the term of the agreements. Distribution of the benefit proceeds was left entirely to the trustees' discretion, and the Plaintiffs made no commitment that reasonably can be construed to have promised, suggested, or implied that the welfare benefits (or the funding for those benefits) would continue for the lives of their employees. They also point to the fact that the plan to which the Plaintiffs contributed—the 1950 W & R Fund—was effectively dissolved and folded into the UMWA 1950 Pension Trust by the 1974 NBCWA. The Plaintiffs further contend that all of the commitments made by

coal mine operators that have given rise to claims of lifetime welfare benefits by retirees—the guarantee clause, the evergreen clause, and withdrawal liability—were made by other operators in agreements signed ten years and more after any of the Plaintiffs signed their last agreement. The Plaintiffs contend also that they never committed to funding welfare benefits for spouses or the "orphans" who were not directly employed by them. They argue that these substantial expansions of coverage occurred well after the Plaintiffs had moved from mining UMWA mines to other endeavors.

■ However, the Plaintiffs' document-by-document and line-by-line approach in arguing their contractual commitments applies a far narrower standard than Congress must use in dealing with an economic problem. The Plaintiffs' arguments would be more suited to an attack on state legislation under the Contracts Clause. *See United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977). Congress is entitled to consider a broad range of information and concerns in evaluating the need for legislation. It is not limited to the precise language of the contractual documents in considering whether the coal industry as a whole should carry the burden of retiree health-care benefits. *See Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, —— U.S. ——, ——, 113 S.Ct. 2264, 2289, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223–224, 106 S.Ct. 1018, 1025–1026, 89 L.Ed.2d 166 (1986). If Congress interpreted the NBCWAs and the history of health-care coverage in the coal industry as entitling retirees to lifetime benefits, it would not have been alone. *See UMWA v. Nobel*, 720 F.Supp. 1169 (W.D.Pa.1989), *aff'd without opinion*, 902 F.2d 1558 (3rd Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991).

■ Despite the Plaintiffs' focus on the legislative intent to identify those responsible for retiree health benefit liabilities, they failed to show that it is irrational that Congress determined that operators under the NBCWAs of the 1950s and 1960s were at least in some part accountable. The dispute about when lifetime health benefits were promised to retired mine workers and by whom is a multi-sided contest, pitting coal mine operators from different eras against each other, as well as involving present and former mineworkers and their families. A congressional decision to come down on the side of the retirees and their spouses and dependents is not totally void of reason. It may not be the best or fairest choice, but it is not irrational or arbitrary in the constitutional sense.

■ The Plaintiffs attempt to distinguish *Turner Elkhorn*, which affirmed the responsibility of mine operators to fund a compensation scheme for those afflicted with Black Lung disease as a result of coal mine work. The Plaintiffs argue that the Black Lung compensation scheme made each operator responsible only for the expenses related to its own workers, whereas the Coal Act imposes liability for the "orphans" with whom the Plaintiffs had no direct employment connection. However, this argument ignores that the Plaintiffs benefitted from the pool of available UMWA workers, even if it only hired some of them. The availability of health-care benefits may have contributed to the existence of that workforce pool. The Plaintiffs' narrow reading of *Turner Elkhorn* ignores subsequent recognition of pooled responsibilities. *See Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

■ The Plaintiffs also argue that they cannot be held responsible for retiree health benefits at this late date because they did not control the benefit fund to which they did contribute. They point to the fund trustees as the responsible parties for the funding crisis faced by Congress. This view fails to consider that the Plaintiffs' retirees (including those miners who accumulated only some of their retirement credits while working for the Plaintiffs) drew benefits from the fund long after the Plaintiffs terminated their contributions. Further, because it was the practice to pay retiree health benefits, this drain

on the fund could have been expected. To the extent that Congress could have found that mine operators who terminated welfare contributions in the 1950s and 1960s "dumped" their future retirees on the operators who continued to make contributions, a legislative decision to recognize responsibility for that "dumping" cannot be said to be totally irrational. There may be many parties responsible for the underfunded condition of mine worker retiree health plans as Congress addressed the problem in 1992. It is not an appropriate function of the courts to evaluate whether Congress most correctly and fairly assessed the blame for that crisis when it enacted the Coal Act. The Plaintiffs' due process challenge fails unless they can show that responsibility was placed on them in a completely irrational manner. To this point, they have not done so.

 In reviewing the Coal Act, the court is not limited to measuring the law against the stated purpose. A due process test is not whether the legislation meets an explicitly stated legitimate governmental purpose. Instead, the more appropriate question is whether the legislation serves any *hypothetical* legitimate purpose. *Northside Sanitary Landfill, Inc. v. City of Indpls.*, 902 F.2d 521, 522 (7th Cir.1990).

 Here, the legislation appears to stand up to a due process challenge measured by either the stated purpose or a hypothesized reason. It holds those responsible, if only in part, liable. Congress is well within its authority in viewing the history of collective bargaining in the mining industry to determine that operators like these Plaintiffs created an atmosphere that promised lifetime health benefits to those who would retire from the industry. In return, such operators received labor at the time. But even if that reason is not good enough, Congress had a wide variety of choices when confronted with this subject. It could have ignored the problem and allowed the miners and operators to continue to battle over this intractable predicament at bargaining tables and on picket lines. It could have decided that the population as a whole could pay for the retiree benefits through the expenditure of tax revenues. It could have levied a spe-

cial tax on coal being mined or used in the future. The potential choices could be endless. Congress chose to impose this financial burden, at least in part, on the Plaintiffs. While the Plaintiffs have presented very good arguments demonstrating that this was not the best choice, they have not shown that it makes no sense at all. Placing the burden on the Plaintiffs by the Coal Act is certainly more rational than selecting cattle ranchers or used car dealers to pay for UMWA retiree health benefits. The Plaintiffs did work in the industry at one time. Perhaps even without more, that is enough to keep their connection with the current financial obligation from being considered arbitrary and void of reason. But there is more, as discussed above.

## 2.) *TAKINGS*

 With regard to the Plaintiffs' "takings" challenge, the degree of deference to legislative action may not be as great as compared to the due process challenge, but the Plaintiffs' burden of making out a case under that theory is not slight. *See Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Given the court's determination that the Plaintiffs are not likely to prevail on the merits of the due process claim, it is not surprising that their "takings" theory would suffer the same fate at this preliminary stage of the case. Plaintiffs frame their takings argument around the three-factor test discussed in *Connolly*, namely, "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with investment backed expectations'; and (3) 'the character of the governmental action.'" *Id.* at 225, 106 S.Ct. at 1026 (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). It really is not disputed that the Coal Act will cost the Plaintiffs a significant amount of money.

 It is fairly estimated that the Plaintiffs' payment obligations could continue for thirty or more years. However, the mere requirement of paying funds is not enough to make out a taking. The Plaintiffs would also have to show that the required payments will

be completely out of proportion to their activity under the NBCWAs. *Id.*, 475 U.S. at 226, 106 S.Ct. at 1027. The Plaintiffs' financial burden under the Coal Act is certainly lessened to some degree by the transfers from the 1950 Pension Trust and the Reclamation Fund. For the reasons discussed in connection with the due process challenge, the Plaintiffs have not met their burden on this question. Regarding the interference with investment-backed expectations, this court takes the Plaintiffs' argument to be nothing more than a statement that they have gone on to do other things since abandoning coal mining. They have not shown that reliance on the language of the NBCWAs justified an expectation that they would never have responsibilities to their own retirees or to others retiring from that industry. That argument was laid to rest in *Connolly. Id.* at 223, 106 S.Ct. at 1025. Finally, the question of the character of the governmental act was also disposed of in *Connolly.* Much like the Multiemployer Pension Plan Amendments Act discussed in *Connolly*, the Coal Act adjusts the benefits and burdens of economic life to further a common benefit—in this instance, health care for retirees from the industry from which the Plaintiffs withdrew. There is no physical invasion or permanent appropriation of the Plaintiffs' assets for the government's own use. *Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* — U.S. —, at —, 113 S.Ct. 2264, at 2290, 124 L.Ed.2d 539 (1993). In short, the Plaintiffs' showing under the Takings Clause does not justify issuing a preliminary injunction. They have not shown even a negligible chance of prevailing on that claim.

## III. *CONCLUSION*

Having said the above, this court is quick to caution that its discussion of these issues is limited to the facts brought before it in the exaggeratedly rapid atmosphere of a preliminary injunction proceeding brought at a time and in a manner to hit the court just as the challenged legislation was about to have a direct financial impact. The court has had little time to consider this matter, and it is well aware that a ponderous weight of authority sits on the side of all economic regulations. On a fully developed record, this court's view of the evidence may be different. Of course, at this stage, the Plaintiffs needed to show that they have more than a slight chance of ultimately prevailing on the merits. *Roland Machinery Co. v. Dresser Ind., Inc.,* 749 F.2d 380, 387 (7th Cir.1984) quoting *Omega Satellite Prods. Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982). Given the vast authority of Congress in allocating the benefits and burdens of social and economic issues, this court cannot anticipate even that slight chance at present. Even if slim, some rationality of the legislative scheme as it affects these Plaintiffs is present. However, the legislative scheme presented by the "reachback" provisions of the Coal Act must be at the very edge of the broad range of permissible legislative allocation of specific economic burdens. Perhaps it is over that edge, although it does not appear to be so at this early stage in the proceedings. The extreme length of the "reachback" is remarkable, and the court can find no case exactly like this one. The imposition of retiree health care costs on the Plaintiffs now, thirty or forty years after their exit from the industry, certainly has a draconian air about it. By no means does the court view the Plaintiffs' challenge to the Coal Act as a frivolous attack. However, the character of the decision to allocate responsibility for this economic burden to former participants in the industry does not seem to be different in character from the liability constitutionally imposed for Black Lung disease benefits, pension funding, and environmental contamination as discussed in the cases cited above. Accordingly, the preliminary injunction request is DENIED and the preliminary injunction previously issued on October 25, 1993 will be dissolved.

**ALL OF WHICH IS ENTERED.**