DAVON, INC., Templeton Coal Co., Inc., Sherwood–Templeton Coal Co., Inc., Princeton Mining Co., Inc., and Berwind Corp., Plaintiffs–Appellants,

v.

Donna E. SHALALA, Secretary, United States Department of Health and Human Services, and United Mine Workers of America Combined Benefit Fund, and its Trustees, Marty D. Hudson, et al., Defendants–Appellees.

Nos. 95–1960, 95–2306.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1995.

Decided Jan. 25, 1996.

Louis F. Britton, Cox, Zwerner, Gambill & Sullivan, Terre Haute, IN, John W. Fischer (argued), Denlinger, Rosenthal & Greenberg, Cincinnati, OH, for Davon, Inc.

Jill E. Zengler, Office of the United States Attorney, Indianapolis, IN, Donna Morros Weinstein, Department of Health and Human Services, Region V, Office of the General Counsel, Chicago, IL, Douglas Letter, Scott R. McIntosh (argued), Department of Justice, Civil Division, Appellate Section, Washington, DC, Gretchen E. Jacobs, Department of Justice, Washington, DC, for Donna E. Shalala.

Frederick W. Dennerline, III, Edward J. Fillenwarth, Jr., Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, Peter Buscemi (argued), Dean C. Berry, Morgan, Lewis & Bockius, Washington, DC, John R. Mooney, Elizabeth A. Saindon, Edward M. Gleason, Jr., Beins, Axelrod, Osborne, Mooney & Greene, Washington, DC, for United Mine Workers of America Combined Benefit Fund.

David H. Goeller, Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, Terre Haute, IN, Rosemary M. Collyer, J. Michael Klise, Michael A. Bazany, Jr., Crowell & Moring, Washington, DC, Jesse H. Choper (argued), University of California, Berkeley, CA, for Templeton Coal Co., Inc., Sherwood–Templeton Coal Co., Inc., Princeton Mining Co., Inc., and Berwind Corp.

Edward J. Fillenwarth, Jr., Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, (argued), Peter Buscemi Morgan, Lewis & Bockius, Washington, DC, John R. Mooney, Elizabeth A. Saindon, Edward M. Gleason, Jr., Beins, Axelrod, Osborne, Mooney & Greene, Washington, DC, for Marty D. Hudson, Michael Holland, Elliot A. Segal, Thomas O.S. Rand, Carlton R. Sickles, Gail R. Willensky, and William P. Hobgood.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

This case involves challenges to the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701 et seq. ("Coal Act"). Congress enacted the Coal Act to guarantee that retired coal miners and their families would receive health benefits for life. The Act was passed in response to a financial crisis that threatened the viability of the existing health benefit arrangement between miners and mining companies as well as the overall stability of the coal industry. The source of the financial crisis was simple: too many beneficiaries under the industry-wide health benefit plan and too few contributing employers. Thus when Congress passed the Coal Act, it mandated that all current and former coal operators contribute to a combined fund on a proportionate basis, including former coal operators that had not signed a collective bargaining agreement for health benefits since 1950. Plaintiffs in this case are five such former coal operators. None is presently in the coal industry and most have not mined coal for at least thirty years. All are required to pay premiums under the Coal Act because, at a minimum, they each signed a collective bargaining agreement in 1950. Plaintiffs argue that the reach-back financing provision of the Act is unconstitutional as applied to them under both the Due Process Clause and the Takings Clause of the Fifth

Amendment. The district court disagreed and entered summary judgment against plaintiffs. We now affirm.

## I.

The following is a relatively brief factual background to the present controversy. More exhaustive accounts are available. See *In re Chateaugay Corp.*, 53 F.3d 478, 481–486 (2d Cir.1995), certiorari denied, — U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204; *Templeton Coal Co. v. Shalala*, 882 F.Supp. 799, 805–810 (S.D.Ind.1995); *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395, 1398–1401 (S.D.Ohio 1993).

## A.

### Background to the Coal Act

The Coal Act is Congress's solution to a national health benefit problem long in the making. In 1946, the United Mine Workers of America ("UMWA") staged a nationwide strike over the refusal of coal operators to create a health and retirement fund. President Truman nationalized the coal mines and ordered negotiations with the Secretary of the Interior. The result was a collective bargaining agreement known as the "Krug–Lewis Agreement" that established a broad outline for employer-sponsored health and welfare programs. The coal mines were returned to private control in 1947, and the first in a series of National Bituminous Coal Wage Agreements ("NBCWAs") between the UMWA and the Bituminous Coal Operators Association, Inc. ("BCOA"), a multi-employer association of coal producers, was agreed upon. NBCWAs governed the terms and conditions of employment in coal mines operated by BCOA members, as well as non-BCOA "me too" operators that agreed to be bound by the terms of the NBCWAs.

The 1950 NBCWA established the United Mine Workers of America Welfare and Re-

tirement Fund of 1950 ("1950 W & R Fund"), which succeeded the then-governing 1947 UMWA Welfare and Retirement Fund. The 1950 W & R Fund was intended to provide benefits to working and unemployed miners, their spouses and dependent children under age 18, retired miners and their spouses, widows of deceased miners, and relatives of deceased miners who cared for the miners' orphaned children. The program included the payment of unlimited hospitalization and in-hospital medical care as well as disability, death, or retirement benefits. Signatory coal operators contributed to the Fund on a per-ton royalty basis at rates specified in successive NBCWAs or amendments. Trustees of the Fund retained discretion over the amount and nature of benefits to be paid.[1] The Fund was the exclusive provider of health, pension, and other welfare benefits for UMWA active and retired miners and their dependents, and its operation remained essentially unchanged from 1950 through 1974.[2]

In 1974, the BCOA and the UMWA agreed to divide the 1950 W & R Fund into four separate multi-employer plans: two for pension benefits and two for other benefits. This was largely in response to the enactment of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), which mandated that pension plans be fully funded on an actuarial basis. The two non-pension plans were known as the UMWA 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the UMWA 1974 Benefit Plan and Trust ("1974 Benefit Trust"). The 1950 Benefit Trust provided health benefits to miners who retired before 1976 and their dependents, while the 1974 Benefit Trust provided health benefits to miners who were active, or who retired on or after January 1, 1976, and their dependents.

Economic difficulties that ultimately led to the Coal Act surfaced in the late 1970s. Sev-

---

**1.** Plaintiffs point to numerous occasions from 1950 to 1960 on which the Trustees exercised their authority to terminate, decrease, or otherwise modify benefits.

**2.** Subsequent to the 1950 agreement, NBCWAs were negotiated by the UMWA and the then-operating coal producers in 1955, 1956, 1958,

1964, 1966, 1968, and 1971. From 1950 to 1974, the Fund and its predecessors collected approximately $3.9 billion in contributions from coal operators and paid approximately $1.5 billion in hospital and medical care benefits, $283 million in survivors and other related benefits, and $2 billion in pension benefits.

eral factors caused the restructuring of the UMWA Benefit Trusts in 1978, including a significant reduction in the amount of coal produced under the NBCWAs, the retirement of a generation of miners, the rapid escalation of health care costs, and the steady increase in the number of "orphan" retirees—those whose employers either had gone out of business or had switched to non-UMWA labor. After a 111–day strike and tense negotiations, the UMWA and BCOA agreed to what would be the last restructuring of the UMWA benefit trusts. The 1978 NBCWA continued the multi-employer approach for providing health care benefits to persons who retired before January 1, 1976, but it provided that persons who retired on or after that date would receive health care benefits from single-employer plans maintained by the retirees' "last NBCWA signatory employer." The 1974 Benefit Trust was retained for miners who retired on or after January 1, 1976, and whose last signatory employers were no longer in business. The 1978 NBCWA also added "guarantee" and "evergreen" clauses, which obligated signatory operators to make sufficient contributions to ensure benefits and to continue making contributions after the expiration of the NBCWA.

The basic trust structure was maintained by subsequent NBCWAs in the 1980s, but economic difficulties continued and worsened. By 1990, the UMWA Benefit Trusts had incurred debts of over $100 million, and their funding from coal producers was decreasing faster than the beneficiary population. The crisis led to a 10–month strike at the Pittston Coal Company and threatened the stability of coal production as well as the economies of coal-producing states. As part of the settlement of the Pittston strike, the Secretary of Labor established the Advisory Commission on United Mine Workers of America Retiree Health Benefits ("Coal Commission") to make recommendations to assure the long-term viability of the 1950 and 1974 Benefit Trusts.

The Coal Commission issued its report in November 1990, documenting the financial crisis of the UMWA Benefit Trusts and stating that the primary culprit was the escalat-

ing cost of paying for "orphan" retirees whose last NBCWA signatory employer had either left the coal business or was otherwise not a contributing coal producer. The Commission made findings and recommendations as follows: (1) that retired miners are entitled to health care benefits that were promised them and that such commitments must be honored; (2) that a statutory obligation to contribute to the trusts should be imposed on current and former signatories to NBCWAs; and (3) that mechanisms should be enacted to prevent the future dumping of retiree health care costs on the UMWA Trusts. The Coal Commission proposed two alternative methods for financing orphan retirees: (1) a quasi-governmental corporation financed by an industry-wide tax on all coal operators; and (2) a private multi-employer fund financed by signatories to the 1978 and later NBCWAs, and, to provide benefits for orphaned retirees, further funded by all employers that were signatories to one or more NBCWAs in the past.

### B.

### The Coal Act

After the Coal Commission issued its report, Congress commenced hearings to consider its findings and recommendations. See *Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing Before the Subcomm. on Medicare and Long–Term Care of the Senate Finance Comm.,* 102d Cong., 1st Sess. (1991) *("Senate Hearings").* In October 1992, Congress passed the Coal Act as part of the Energy Policy Act of 1992 with the following stated purpose:

> to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees of the coal industry ... [and] to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans.

Pub.L. No. 102–486, § 19142(b). Congress found that the coal industry's existing system for funding retiree health benefits had to be modified "to identify persons most responsible for plan liabilities...." *Id.* § 19142(a).

The Coal Act merged the 1950 and 1974 Benefit Trusts into the UMWA Combined Benefit Fund ("Combined Fund"). 26 U.S.C. § 9702(a)(2). The Combined Fund provides benefits to coal industry retirees who, as of July 20, 1992, were eligible to receive and were receiving benefits from the 1950 or 1974 Trusts. 26 U.S.C. § 9703.

Congress adopted a financing arrangement similar to the Coal Commission's second alternative recommendation.[3] Every coal operator that signed NBCWAs is required to participate in the Combined Fund's financing. 26 U.S.C. § 9701(b), (c)(1). The task of assigning beneficiaries under the Act was given to the Secretary of Health and Human Services ("Secretary"). 26 U.S.C. § 9706(a). Each signatory must pay premiums for its own former employees and their covered dependents, as well as a proportional share of the premiums for "orphan" retirees whose employers have gone out of business. 26 U.S.C. § 9704(a)–(d). If a retiree worked for more than one signatory, he is assigned to the most recent that signed an NBCWA in 1978 or after. 26 U.S.C. § 9706(a)(1)–(2). If none signed in or after 1978, the retiree is assigned to the pre–1978 signatory that employed him for the longest period prior to 1978. 26 U.S.C. § 9706(a)(3).

### C.

### The Plaintiffs

The plaintiffs in this case are companies that signed the 1950 NBCWA. Several plaintiffs also signed successor NBCWAs in the 1950s and 1960s; however, none signed the 1974 NBCWA nor any subsequent NBCWA. Because the Coal Act's financing provision reaches back to 1950 NBCWA signatories, each plaintiff has been assigned beneficiaries under the Act and as such is obligated to pay premiums to the Combined Fund. This is a consolidated appeal arising out of two separate but related suits by plaintiffs. The first complaint was filed by Templeton Coal Company ("Templeton"), Sherwood–Templeton Coal Company ("Sherwood"), Princeton Mining Company ("Princeton"), and Berwind Corporation ("Berwind"). Collectively, we will refer to these plaintiffs as the "Templeton Employers." The relevant background of each follows:

(1.) Templeton. Incorporated in 1920, Templeton closed its last mine in 1954. Currently, it engages in business that is unrelated to coal production. Templeton signed the 1950 NBCWA and its amendments in 1951 and 1952; it stopped participating in the UMWA Funds in 1954. The Secretary assigned 39 beneficiaries to Templeton at a first-year cost of $138,131.35.[4]

(2.) Sherwood. Incorporated in 1929, Sherwood, a wholly owned subsidiary of Templeton as of 1967, sold its last mine in 1960 and is currently engaged in business unrelated to coal production. Sherwood signed the 1950 NBCWA and its amendments in 1951, 1952, 1955, 1956, and 1958; it last participated in the UMWA Funds in 1960. The Secretary assigned four beneficiaries to Sherwood at a cost of $15,147.22 for the first year.

(3.) Princeton. Incorporated in 1923, Princeton stopped mining coal in 1966 and is also currently engaged in non-coal activities. Princeton was a signatory to the 1950 NBCWA and subsequent amendments in

---

**3.** The parties disagree over whether the Coal Commission's second alternative proposal recommended a reach-back to 1950 signatories or only to 1978 signatories. Defendants cite the following language from the Commission as support for their statement that it recommended a reach-back to 1950 signatories:

> Instead of imposing a new tax on all coal operators and establishing an agency of the federal government, *this plan seeks additional revenues from a broadened base of current and past signatories to the contracts*, establishing and providing revenues for the Benefit Funds. Past obligations would be defined as those arising from firms once signatory who may be

identified through a chain of succession to a current operator. (emphasis added by defendants).

We note only that this language is ambiguous and that it is therefore not clear whether Congress "reached-back" further than the Commission recommended. In any event, the question whether reaching back beyond 1978 signatories was rational subsumes the question whether it was rational to ignore the Coal Commission.

**4.** The figures for assigned beneficiaries are for the first year only. In some cases, the companies were assigned additional beneficiaries in subsequent years.

1951, 1952, 1955, 1956, and 1958; it participated in the UMWA Funds until 1966. Princeton was assigned 117 beneficiaries at a first-year cost of $419,325.17.

(4.) Berwind. Originally Berwind–White Coal Mining Company, it was a signatory to the 1950 NBCWA and its amendments in 1951, 1952, 1955, 1956, and 1958. Berwind closed its last mine in 1962, but in January 1963 it merged with another coal company and became a 98% shareholder of Reitz Coal Company; Reitz was a signatory to the 1968, 1971, 1974, 1978, and 1981 NBCWAs. Currently, Berwind owns the Berwind Natural Resources Corporation, which is the parent of several coal companies; these companies pay royalties to Berwind on the coal mined. The Secretary assigned by far the largest number of beneficiaries to Berwind among the plaintiffs—914 at a first-year cost of $3,227,727.96.

The second complaint was filed by Davon Incorporated ("Davon"). Davon's predecessor, the New York Coal Company, was engaged in coal mining from 1933 until 1954. During this time, it employed UMWA-represented miners and was signatory to the 1950 NBCWA and its 1951 and 1952 amendments.[5] New York Coal sold its coal mining business in 1954 to Sunnyhill Coal Company and agreed as part of the sale not to engage in the coal business. In 1957, New York Coal became Davon, Inc., through an asset purchase. Neither New York Coal nor its successor Davon has engaged in coal mining since 1954. The Secretary assigned 98 beneficiaries to Davon for a first-year cost of $327,428.80.

The beneficiaries assigned to each of the five plaintiff-companies consist of approximately 30 percent retired UMWA miners who worked for plaintiffs and 70 percent spouses and dependents of those miners. Plaintiffs point out that many of the beneficiaries assigned to them have only the most tenuous connection to the company. For example, some beneficiaries worked for less

than a day at the contributing company. Nonetheless, the Coal Act requires plaintiffs to pay their health benefits for life. In addition, plaintiffs must also pay premiums for "orphan," or unassigned, miners and relatives. The contributions for unassigned beneficiaries, as stated above, are calculated based on the company's proportion of assigned beneficiaries. These contributions will continue until the last beneficiary dies.

## D.

### Proceedings Below

The Templeton Employers filed suit in the district court on September 2, 1993, challenging the constitutionality of the financing provisions of the Coal Act, 26 U.S.C. § 9704, under the Due Process Clause and the Takings Clause of the Fifth Amendment. The Combined Fund and its Trustees intervened to defend the validity of the statute, but on October 25, 1993, the district court issued an injunction against the Secretary and the Trustees enjoining them from enforcing the Coal Act. On November 3, 1993, Davon filed a complaint against the Secretary and the Combined Fund seeking the same relief as the Templeton Employers. After conducting a hearing, the district court on November 18, 1993, denied Davon's request for injunctive relief and vacated the October 25 injunction in the Templeton Employers' case *sua sponte*. *Templeton Coal Co. v. Shalala,* 855 F.Supp. 990 (S.D.Ind.1993). The court said only that "[w]hen originally issuing the injunction, the court was reading the Due Process and Takings cases too narrowly." *Id.* at 999 n. 10.

The parties subsequently filed cross-motions for summary judgment. On April 4, 1995, the district court denied plaintiffs' motion and granted the motions of the Secretary and the Trustees. *Templeton Coal,* 882 F.Supp. at 799. The district court first rejected plaintiffs' argument that the Coal Act is a retroactive statute subject to heightened scrutiny:

---

**5.** Davon states in its brief that it has no records indicating that its predecessor signed any NBCWA. It noted that the Combined Fund's only basis for concluding that New York Coal was a signatory from 1933 to 1954 was a computer list prepared by the Combined Fund. We are aware of no evidence, and Davon points to none, that the Secretary erred in assigning beneficiaries to Davon.

Because the Coal Act does not write on an historical blank slate, but merely provides for a prospective statutory continuation of collectively-bargained health care premium payments for UMWA miners dating back nearly half a century, the Act imposes neither "new" nor "retroactive" legal duties on Plaintiffs in the constitutional sense.

*Id.* at 815. Ultimately rejecting plaintiffs' due process argument, the district court stated, "Plaintiffs did work in the [coal] industry at one time. This fact ... would be enough to keep Plaintiffs' connection to the current financial obligation from being considered arbitrary or void of reason." *Id.* at 821. The court also rejected plaintiffs' Takings Clause argument, primarily because it considered unreasonable any expectation by the plaintiffs that they would never again be responsible for health benefits for retired UMWA miners, especially in light of the continued provision of such benefits and the pervasive nature of government regulation in every facet of the coal mining industry. *Id.* at 826.

## II.

■ On appeal, the Templeton Employers and Davon argue that the district court erred in granting defendants' motion for summary judgment. Specifically, they argue that the reach-back financing provision of the Coal Act is unconstitutional as applied to them under the Due Process and Takings Clauses of the Fifth Amendment. We will address these arguments in turn. This Court reviews the grant of summary judgment *de novo*. *East Food & Liquor, Inc. v. United States,* 50 F.3d 1405, 1410 (7th Cir.1995).

## A.

### Due Process

■ The constitutional analysis necessarily begins with a discussion of the appropriate standard of review. The Coal Act is "a classic example of an economic regulation—a legislative effort to structure and accommodate 'the burdens and benefits of economic life.'" *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 83, 98 S.Ct. 2620, 2636, 57 L.Ed.2d 595 (quoting *Usery v.*

*Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752). Because the Coal Act is an economic regulation that burdens no fundamental rights, it is subject only to the minimum scrutiny, rational basis test:

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Turner Elkhorn,* 428 U.S. at 15, 96 S.Ct. at 2892. Substantive due process requires only that economic legislation be "supported by a legitimate legislative purpose furthered by rational means." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601.

In mounting a due process challenge to the Coal Act, plaintiffs in this case must maneuver through "unusually inhospitable legal terrain." *In re Chateaugay Corp.,* 53 F.3d 478, 487 (2d Cir.1995) (rejecting due process challenge to the Coal Act), certiorari denied, —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204. As the Second Circuit noted, since the 1935 decision in *Railroad Retirement Bd. v. Alton R.R.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468, the Supreme Court has failed to invalidate a federal economic regulation on substantive due process grounds. 53 F.3d at 487 (citing numerous Supreme Court cases upholding economic regulation). Instead, the Court has increasingly deferred to congressional judgment on economic policy, explicitly acknowledging the presumption in favor of constitutionality and reviewing only for rationality. As stated in *Duke Power,* that Congress's economic choices "may have profound and far-reaching consequences ... provides all the more reason for this Court to defer to the congressional judgment unless it is demonstrably arbitrary or irrational." 438 U.S. at 83–84, 98 S.Ct. at 2636.

■ Plaintiffs argue that we should subject the Coal Act to heightened scrutiny because it is an economic regulation that is applied retroactively. Retroactive legislation, they argue, imposes an added burden

**1122**

for judicial review, and such regulations are unconstitutional if they produce "harsh and oppressive" results. Plaintiffs' argument has two important components. First is the question whether the Coal Act is retroactive legislation; the second component is how retroactivity changes the due process analysis. The parties make much over whether the Coal Act is retroactive. We agree with plaintiffs that the Coal Act, as applied to them, is retroactive: "[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already passed, must be deemed retrospective." *Landgraf v. USI Film Prods.*, — U.S. —, —, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229. More succinctly, a "court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* Clearly that is the case here. The Coal Act attaches new legal consequences—mandatory payments to the Combined Fund—for the act of participating in some previous NBCWA. Accord *Chateaugay*, 53 F.3d at 489 (Coal Act has retroactive effect); *Barrick Gold Exploration, Inc. v. Hudson*, 47 F.3d 832, 836–837 (6th Cir.1995) (same), certiorari denied, —

U.S. —, 116 S.Ct. 64, 133 L.Ed.2d 26. The district court's statement that the "Coal Act is simply not 'retroactive' for purposes of due process analysis," *Templeton Coal*, 882 F.Supp. at 813, is likely directed at the legal consequences of calling the statute "retroactive" rather than the actual reach of the statute.

The second component of plaintiffs' argument is their assertion that the retroactive nature of the Coal Act subjects it to greater scrutiny under the Due Process Clause. Unfortunately for plaintiffs, Supreme Court precedent could not be more clearly contrary to their position.[6] In *Turner Elkhorn, supra,* the Supreme Court upheld against constitutional attack the Black Lung Benefits Act of 1969, which in part required compensation for disabilities caused during employment prior to the statute's enactment. Plaintiffs cite the following language from *Turner Elkhorn* in support of their argument:

> It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.

**6.** Plaintiffs argue that retroactive legislation such as the Coal Act is unconstitutional if it is "harsh and oppressive." They claim that the "harsh and oppressive" inquiry is a multi-factor analysis, focusing on, for example, the length of period affected, the foreseeability of the legislation, the disruption to settled expectations, and whether a party relied on the state of the law at the time it acted. In support, plaintiffs cite a host of cases, all of which are either misconstrued by plaintiffs or inapposite to this case. Plaintiffs' citation to cases addressing the constitutionality of revenue statutes is misplaced. The "harsh and oppressive" standard originated in *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87, and has since been applied in other revenue statute cases, *e.g., United States v. Hemme*, 476 U.S. 558, 568–572, 106 S.Ct. 2071, 2077–2080, 90 L.Ed.2d 538, but the Court has made clear that the "harsh and oppressive" analysis as applied to economic legislation "does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in *Turner Elkhorn.*" *Gray*, 467 U.S. at 733, 104 S.Ct. at 2720; see also *United States v. Carlton*, — U.S. —, —, 114 S.Ct. 2018, 2022, 129 L.Ed.2d 22; *Furlong v. C.I.R.*, 36 F.3d 25, 26–27 (7th Cir.1994). Cases from this Circuit confirm that when addressing economic legislation, the

"harsh and oppressive" standard is merely a search for rationality per *Turner Elkhorn* and its progeny. See *Rhinebarger v. Orr*, 839 F.2d 387, 389 (7th Cir.1988), certiorari denied, 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 48; *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1269 (7th Cir.1983), certiorari denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855.

In support of their argument that the "harsh and oppressive" standard encompasses a multi-factor test, plaintiffs read too much into several Supreme Court and Seventh Circuit cases. None of the cases cited applies a multi-factor test like the one plaintiffs propose and most are taken from revenue statute cases—cases that the Supreme Court has recently clarified should be governed by the rationality standard. See *Carlton, supra.* In addition, several of the factors alleged to be relevant are taken from cases interpreting the Contract Clause, even though the Supreme Court has explicitly stated that "federal economic legislation ... is not subject to constraints coextensive with those imposed upon the States by the Contract Clause...." *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers' Pension Trust for S. Cal.*, 508 U.S. 602, 113 S.Ct. 2264, 2289, 124 L.Ed.2d 539; see also *Gray*, 467 U.S. at 733, 104 S.Ct. at 2719.

428 U.S. at 16–17, 96 S.Ct. at 2893. However, plaintiffs ignore the true import of the Court's language. Far from saying that the retroactive aspects of legislation are subject to heightened scrutiny, the Court stated that both the retroactive and the prospective aspects are subject to the test of due process. The test of due process in assessing economic legislation is rationality. Thus the Court went on to inquire into the rationality of imposing liability for past actions. It concluded as follows:

> We find ... that the imposition of liability for the effects of disabilities bred in the past is justified as a *rational* measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor....

*Id.* at 18, 96 S.Ct. at 2983 (emphasis added). There can be no doubt about the Court's deference to Congress regarding retroactivity:

> [I]t is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators ... or to impose that liability solely on those early operators whose profits may have been increased at the expense of their employees' health. We are unwilling to assess the wisdom of Congress' chosen scheme.... It is enough to say that the Act approaches the problem of cost spreading *rationally* ....

*Id.* at 18–19, 96 S.Ct. at 2894 (emphasis added).

That the same due process standard applies to retroactive economic legislation was confirmed in *Gray, supra.* In that case, the Court upheld the Multi–Employer Pension Plan Amendments Act of 1980 ("MPPAA"), which was applied retroactively to employers withdrawing from pension plans up to five months prior to enactment. The Court elucidated the somewhat misleading language from *Turner Elkhorn* that "[i]t does not follow ... that what Congress can legislate prospectively it can legislate retrospectively," stating that the burden to justify retroactivity in economic legislation "is met simply by

showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Gray,* 467 U.S. at 730, 104 S.Ct. at 2718 (quoting *Turner Elkhorn,* 428 U.S. at 16–17, 96 S.Ct. at 2892). The Court once again confirmed the meaning of *Turner Elkhorn* and *Gray* in *General Motors Corp. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328, where it stated that the retroactive aspects of economic legislation, as well as the prospective aspects, must meet the due process test: "a legitimate legislative purpose furthered by rational means." *Id.* at 191, 112 S.Ct. at 1112.

■ Plaintiffs are correct that this Court must give additional consideration to the retroactive effects of the Coal Act; however, they are incorrect in asserting that we must look beyond the rationality of Congress's economic choices. The additional consideration required by *Turner Elkhorn, Gray,* and *Romein* is that the retroactive aspects of economic legislation must be justified *independently* of the prospective aspects. In other words, Congress must have an independent rational basis for making a law retroactive, even where the prospective aspects of the legislation are plainly rational. This methodology was meticulously employed in *Turner Elkhorn.* There the Black Lung Benefits Act was plainly rational as to current employees of existing mining companies, but the Court independently analyzed the rationality of spreading the costs to companies for injuries bred in the past, including companies out of the mining business. The Court found the retroactive portion of the Act rational because it imposed liability on companies that profited from the fruits of the injured miners' labor and because those companies might have taken steps in the past to minimize black lung dangers. 428 U.S. at 18, 96 S.Ct. at 2893.

■ Thus we must independently analyze the retroactive aspects of the Coal Act's financing provisions and determine whether Congress chose rational means to further its legislative purpose.[7] Congress certainly had

---

7. The legitimacy of the legislative purpose is not seriously at issue in this case. The Coal Act's stated purposes are to "remedy problems with the provision and funding of health care benefits" under the 1950 and 1974 Trusts, to establish "sufficient operating assets for such plans," and

several alternatives available to finance the Combined Fund. It could have restricted required contributions to the signatories of the latest NBCWA or, at the other extreme, raised funds from all existing coal companies or from general tax revenues. Congress also had several intermediate alternatives. For example, it could have reached back only to the 1978 NBCWA, which created the "guarantee" and "evergreen" clauses; to the 1974 NBCWA, which created the 1950 and 1974 Trusts; or to the 1950 NBCWA, which created the predecessor of all the trusts. In reviewing its final choice, we note that Congress "had absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 477, 105 S.Ct. 1441, 1457, 84 L.Ed.2d 432. We may find rationality so long as a rational basis exists for the statute's retroactivity, regardless of whether Congress actually considered the basis. This is so because "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211. The existence of several such rationales for the Coal Act demonstrates that Congress's decision to reach back to 1950 NBCWA signatories was far from arbitrary.

■ First, every NBCWA signatory company profited from the labor of its retired miners. Plaintiffs in this case each employed at some time retired miners covered under the Coal Act and thus benefitted from their labor. Congress could rationally have concluded that a company which profited in the coal industry from the labor of retired miners should be held proportionally responsible for guaranteeing health benefits. When viewed in this light, it would have been irra-

tional to draw the line anywhere other than 1950 NBCWA signatories.

Plaintiffs respond that the Coal Act forces them to finance benefits for "orphan" retirees who never worked for them and thus never benefitted their mining operations. Given that plaintiffs benefitted from the labor of retired mine workers the same as companies still operating in the coal industry, it was rational for Congress to require all contributing coal companies to share responsibility for "orphan" beneficiaries. The essential premise of the Coal Act, as the district court noted, is proportionality. Plaintiffs are assigned "orphan" beneficiaries proportional to their overall participation in the Combined Fund, and the Coal Act makes provision for proportionally reducing plaintiffs' responsibility for "orphan" retirees as statutory transfers are received from the 1950 Pension Fund and the Abandoned Mine Reclamation Fund. 26 U.S.C. § 9705(a)(3)(B) & (b)(2). These provisions, which effectively mitigate the burden of operators to fund "orphan" retirees, further demonstrate the rationality of Congress's financing scheme. We cannot say that Congress's scheme of proportionality is arbitrary or irrational.

■ Second, every NBCWA signatory company shared some responsibility in creating a legitimate expectation among miners of lifetime health benefits. Imposing liability on companies that have profited from the retirees' labor was found rational in *Turner Elkhorn*, 428 U.S. at 18, 96 S.Ct. at 2893. Every signatory company, including plaintiffs, participated in the creation and development of a multi-employer health benefit program that provided lifetime health benefits for retirees for almost fifty years. Congress could rationally have concluded that such participation led to a legitimate expectation of lifetime health benefits that should be

to ensure "the delivery of health care benefits to the beneficiaries of such plans." Pub.L. No. 102–486 § 19142(b). Given the importance of coal to the economy, the likelihood of further labor unrest, the serious financial problems with the 1950 and 1974 Trusts, and the importance of health care provisions to approximately 100,000 retired coal miners, the legitimacy of Congress's legislative purpose is easily established by defen-

dants. Plaintiffs' only attack involves questioning Congress's "real" motives in passing the Coal Act and calling the Coal Act a "special-interest deal." Plaintiffs' attack is based only on speculation; regardless, it matters not for constitutional purposes whether Congress was actually motivated by the stated reasons for the legislation. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211.

honored under the Coal Act. Again, in this light, it would have been arbitrary to draw the line anywhere other than at all NBCWA signatories. Plaintiffs respond that it was not until the 1974 NBCWA and the "guarantee" and "evergreen" clauses of the 1978 NBCWA that miners were promised lifetime health benefits—promises that plaintiffs never made. Therefore, they argue, it was irrational for Congress to require contributions from pre–1974 signatories.[8] But the fact that plaintiffs never contractually agreed to provide lifetime benefits does not rebut the rationality of finding that they contributed to the expectation of lifetime benefits. The Coal Commission and Congress found that the promise of lifetime benefits dates back to the 1940s, even though it is not explicit in any NBCWA until 1974. Even if no such promise was made, every NBCWA contributed to the expectation by creating a continuous mechanism for providing UMWA multi-employer-sponsored health benefit plans. While individual coal operators such as plaintiffs have come and gone, UMWA retirees have received continuous health coverage paid for by successive UMWA benefit trusts. Plaintiffs were part of this tradition and can rationally be said to have contributed to a reasonable expectation of lifetime health benefits. Their withdrawal from participation in the trusts helped create the financial crisis that resulted in the Coal Act. "It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them." *United States v. Sperry Corp.*, 493 U.S. 52, 65, 110 S.Ct. 387, 396, 107 L.Ed.2d 290.

In arguing that the Coal Act should not have reached back beyond the 1974 or 1978 NBCWAs, plaintiffs state that the Act requires them to fulfill contractual obligations to which they were not a party. They contend that they have fulfilled all of their obligations under the NBCWAs they signed. This argument assumes that the Due Process Clause prohibits Congress from imposing obligations on employers beyond those voluntarily assumed by contract. The assumption is simply wrong. In rejecting a due process challenge to the retroactive withdrawal liability provision of the MPPAA, the Supreme Court in *Gray* stated that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations" and that "this is true even though the effect of the legislation is to impose a new duty or liability based on past acts." 467 U.S. at 729–730, 104 S.Ct. at 2718 (quoting *Turner Elkhorn*, 428 U.S. at 15–16, 96 S.Ct. at 2892–2893). Plaintiffs' contractual obligations under the NBCWAs they signed in no way define the outer limit of Congress's power to legislate consistently with the Due Process Clause.[9] They ignore the significant distinction between a finding of a contractual promise of lifetime benefits and a legislative finding that plaintiffs bear some degree of responsibility. The former is not a prerequisite of the latter. Congress had a rational basis for finding that plaintiffs' responsibility went beyond their contractual promises. See *Concrete Pipe*, 508 U.S. at ——, 113 S.Ct. at 2289 (rejecting argument that rationality review is confined by the extent of a party's contractual obligations).

Third, mandatory contributions from all NBCWA signatory companies were neces-

---

**8.** It is on this basis that plaintiffs here distinguish themselves from the plaintiffs who unsuccessfully challenged the Coal Act in the Second Circuit. See *Chateaugay, supra.* Plaintiffs in *Chateaugay* were signatories to the 1974 NBCWA. However, as we discuss in the text, the rationality of Congress's decision to reach back further than 1974 (a "Super" reach-back, as plaintiffs like to call it) can be justified independently from its decision to reach companies that made contractual promises of lifetime health benefits. As such, distinguishing *Chateaugay* matters little.

**9.** Plaintiffs contend that Congress must find a causal connection between their actions prior to

leaving the coal industry and the financial crisis that led to the Coal Act. Although this Court believes that Congress could rationally find such a connection, plaintiffs cite no binding authority for their proposition, relying instead on statements made in Supreme Court concurrences and dissents. See, *e.g., Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 229, 106 S.Ct. 1018, 1028, 89 L.Ed.2d 166 (O'Connor, J., concurring). Even the statements relied upon by plaintiffs ask only that courts look for rationality; regardless, they are taken from cases interpreting the Takings Clause rather than the Due Process Clause.

sary to secure adequate funding for the Combined Fund. Congress could rationally have concluded that restricting contributions to anything less than all NBCWA signatories would have left the Combined Fund inadequately funded and unable to provide health benefits to all retirees. Congress heard testimony to this effect. See *Senate Hearings,* at 44–45, 279.

Fourth, restricting the statutory obligation to fewer than all NBCWA signatory companies could have resulted in economic conflict in the coal industry. Congress could rationally have concluded that restricting contributions to post–1974 signatories would have placed such a great financial burden on existing coal companies as to cause economic conflict and threaten the financial stability of the national bituminous coal industry. Additionally, allowing the demise of the multi-employer health care system could have had a devastating effect on the economies of the major coal-producing states. Congress at least had a rational basis, given events such as the 1946 strike and the Pittston strike, to think so.

Based on the foregoing, we conclude that the retroactive financing scheme of the Coal Act is a rational means to achieve legitimate legislative purposes. Davon argues that the Coal Act is not rational as applied to it specifically because it purchased the assets of New York Coal after that company had left the coal industry. But the aforementioned rationales apply with equal force to an asset purchaser. Through the asset purchase, Davon benefitted from the profits obtained by New York Coal with its employment of miners. Further, participation by as many signatory companies as possible was necessary both to ensure adequate funding and avert an economic crisis in the coal industry. Thus Congress could rationally have chosen to ignore changes in corporate form that would allow a company to avoid responsibility for retired miners and the Coal Act's required contributions.

▮ Plaintiffs make several additional arguments that, if accepted, would render the Act unconstitutional despite our finding of rationality. First, plaintiffs argue that the retroactive financing provision reaches back

an unprecedented length of time and that the length of the period affected is an especially "significant factor" in the due process inquiry. We agree with the Second Circuit that there is no support for the proposition that the degree of retroactivity itself violates the Due Process Clause. *Chateaugay,* 53 F.3d at 491. Such a proposition would ignore precedent upholding the unlimited retroactive reach of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), see, *e.g., United States v. Monsanto Company,* 858 F.2d 160, 173–174 (4th Cir.1988), certiorari denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019. Further, as the Second Circuit noted, the degree of retroactivity imposed by the Coal Act is not noticeably great when compared to the Black Lung Benefits Act upheld in *Turner Elkhorn:*

> As with CERCLA and the Black Lung Benefits Act, ... the Coal Act triggers current and future liabilities on the basis of past actions, in this case the hiring and firing of workers and the signing of [an NBCWA]. The Coal Act contains no requirement that signatory operators pay for health benefits delivered prior to the effective date of the statute. Thus, the financial impact of the Coal Act on assigned operators is strictly prospective: only the weight and duration of the funding burdens vary according to past acts.

53 F.3d at 491. Congress can make a statute retroactive for as long a period as is rational. We find nothing irrational *per se* about the length of retroactivity in the Coal Act.

Plaintiffs also argue regarding the length of retroactivity that while due process can tolerate a short retroactive period necessary to implement legislation, it cannot tolerate a lengthy retroactive period in which a "wholly new" obligation is imposed. For this proposition plaintiffs cite *Carlton, supra,* which sustained the retroactivity of a Tax Code amendment because it was not a "wholly new tax." As our decision in *Estate of Ekins v. C.I.R.* demonstrates, the "wholly new tax" concept is unique to cases addressing revenue statutes and has no application here. 797 F.2d 481, 484 (7th Cir.1986). Further, the Supreme Court has made clear that stan-

dards articulated in revenue statute cases, when applied to economic legislation, are no different than the *Turner Elkhorn* rationality standard. *Gray*, 467 U.S. at 733, 104 S.Ct. at 2719.

■ Next, plaintiffs argue that the retroactive financing provision of the Coal Act imposes an unforeseeable liability on them. The liability was unforeseeable, they argue, because their participation in collective bargaining agreements occurred so far in the past and because their contractual obligations during that period were much more limited than the obligations imposed by the Coal Act. As such, their foreseeability argument is little more than reiteration. Nonetheless, plaintiffs cite no authority indicating that foreseeability is a due process requirement for retroactive legislation; thus we have searched only for a rational basis. In the same vein is plaintiffs' argument that the Coal Act upsets their settled expectations and therefore offends due process. Even assuming the statute upset their expectations, the Supreme Court has said that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations," and "[t]his is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Turner Elkhorn*, 428 U.S. at 15–16, 96 S.Ct. at 2892–2893.[10]

We conclude that the Coal Act's retroactive financing provision challenged by plaintiffs easily passes the due process rationality test. Our conclusions are consistent with every other court that has addressed the issue. See *Chateaugay, supra; Barrick Gold, supra; Unity Real Estate Co. v. Hudson,* 889 F.Supp. 818 (W.D.Pa.1995); *In re Blue Diamond Coal Co.,* 174 B.R. 722 (E.D.Tenn.1994); *Lindsey Coal Mining Co.*

*Liquidating Trust v. Shalala,* 901 F.Supp. 959 (W.D.Pa.1995).

### B.

### Takings

■ The Takings Clause of the Fifth Amendment—"nor shall private property be taken for public use, without just compensation"—prohibits the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554. In the field of economic legislation, the Supreme Court has noted that "[g]iven the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166. In assessing the merits of plaintiffs' constitutional argument, we are to conduct an "ad hoc" factual inquiry into the particular circumstances of this case, attaching "particular significance" to three factors: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Id.* at 224–225, 106 S.Ct. at 1026 (quoting *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631).[11]

■ The first *Connolly* factor turns on the question of proportionality. The *Connolly* Court, in addressing the withdrawal liability provision of the MPPAA, stated that "the

---

**10.** Plaintiffs further argue that lack of timely notice of impending liability under the Coal Act violates due process. This is nothing more than their unforeseeability and settled-expectations arguments combined. They offer no authority, and we have uncovered none, that timely notice is a due process requirement for retroactive economic legislation. Thus the argument does not alter our conclusion.

**11.** Although plaintiffs do not raise the issue on appeal, defendants note in their brief that a threshold jurisdictional question must be an-

swered: whether the district court could entertain plaintiffs' request for injunctive relief, given the fact that the Takings Clause "does not forbid takings" but merely requires compensation. See *Rose Acre Farms, Inc. v. Madigan,* 956 F.2d 670, 673 (7th Cir.1992), certiorari denied, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 34. We agree with the Second Circuit's reasoning on this issue, *Chateaugay,* 53 F.3d at 491–493, and find no impediment to our review of the district court's Takings Clause decision.

assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions." 475 U.S. at 225, 106 S.Ct. at 1026. The Court concluded,

> There is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of· the MPPAA's regulatory scheme.

*Id.* at 226, 106 S.Ct. at 1026–1027. Finding an employer's withdrawal liability not to be "out of proportion to its experience with the plan," the Court again upheld the MPPAA in *Concrete Pipe & Prods. of Cal. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, ——, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539. The important question, therefore, is whether the basis for regulating plaintiffs under the Coal Act—their participation in prior NBCWAs—is proportional to the economic impact caused by the Act. The Coal Act's financing scheme is based on proportionality. The Act assigns beneficiaries based on the number of retirees employed by the former coal operator, 26 U.S.C. §§ 9704(a)–(c), and it assigns "orphan" retirees on a proportional basis as well. 26 U.S.C. § 9704(d). Thus the district court correctly concluded that plaintiffs' liability under the Act is directly related to their prior status as NBCWA signatories. In addition, the Coal Act takes steps to reduce the economic burden on assigned operators by requiring transfers from the UMWA Pension Plan and the Abandoned Mine Reclamation Fund. 26 U.S.C. § 9705. The Supreme Court has noted the significance of statutory efforts to mitigate the economic impact on individual employers. *Connolly*, 475 U.S. at 225–226, 106 S.Ct. at 1026–1027.

Rather than arguing proportionality, plaintiffs' primary contention focuses on the language of *Connolly* that requires "*experience* with the plan*." They point out that the plans which the Coal Act merged into the Combined Fund did not exist when they were in the coal industry; rather, their ex-perience was with different NBCWAs from much earlier and not with the 1950 and 1974 Benefit Trusts that were merged into the Combined Fund. Thus they claim that the liability imposed on them will always be out of proportion to their experience with the plans. As noted above, the consecutive NBCWAs created a continuous multi-employer scheme for providing health benefits from approximately 1950 to the present. Each of the plaintiffs participated in at least one of the NBCWAs since 1950 and thus had experience with the multi-employer plans. Plaintiffs' argument regarding experience, rather than proportionality, is only persuasive if we accept the premise that the multi-employer plans of 1974 and after are sufficiently different from prior NBCWAs such that experience with the .former does not constitute experience with the latter. Indeed, plaintiffs distinguish the Second Circuit's rejection of the Takings Clause claim because plaintiffs in that case participated in the 1974 NBCWA and later plans that promised lifetime benefits. See *Chateaugay, supra.* We find the distinction wholly unpersuasive. Each consecutive NBCWA, including those after 1974, accomplished the same end—to provide benefits to miners until the next NBCWA—using the same means—funding on a multi-employer basis. Nothing radical happened in 1974. As we stated in the due process context, the promise of lifetime benefits was not an unforeseeable inclusion in an NBCWA; every coal operator that participated in the multi-employer plans contributed directly to the retirees' legitimate expectations of lifetime benefits. Plaintiffs' "experience with the plan[s]" that eventually became the Combined Fund is easily deduced on the facts of this case.

The second factor is the degree of interference with plaintiffs' "reasonable investment-backed expectations." *Connolly*, 475 U.S. at 226, 106· S.Ct. at 1027. The issue is whether plaintiffs had a "reasonable expectation that [they] would not be faced with liability for promised benefits." *Concrete Pipe*, 508 U.S. at —— —— ——, 113 S.Ct. at 2291–2292. They point to two bases for their reasonable expectations. First, they contend that no prior government interest could have forecast their

liability under the Coal Act. It is certainly true that prior to the Coal Act the government had never mandated lifetime health benefits for retired coal miners. It does not follow, however, that the government showed no interest in the coal industry sufficient to put plaintiffs on notice. Federal intervention in the 1946 strike of the UMWA over the refusal of coal operators to create a health and retirement fund led to the Krug–Lewis Agreement. The Agreement, which established a broad outline for employer-sponsored health and welfare programs, resulted in the first NBCWA—a multi-employer plan that continued through amendment and renegotiation until passage of the Coal Act. This early event, affecting as it did the future of health benefits in the coal industry, demonstrated that stability in the coal mining industry was of national importance and that federal intervention to avoid instability was foreseeable. The absence of federal intervention when plaintiffs mined coal is more reasonably attributed to successful private collective bargaining than lack of government interest.

Second, plaintiffs point to the fact that they never promised lifetime benefits and thus did not expect to be held liable for such. Their expectations in this regard would have been unreasonable. The 1950 W & R Fund and its predecessors—as well as the early NBCWAs signed by plaintiffs and subsequent NBCWAs—provided continuous health benefits to miners for almost 30 years prior to the NBCWAs that expressly promised lifetime benefits. Thus plaintiffs' argument ignores the fact that they substantially participated in a system that provided continuous benefits and created legitimate expectations that such provisions would not cease. Any expectation that they could never be held liable for retired miners' health benefits, in light of their participation in the NBCWAs, was not reasonable.

We also note that the contractual promises made by plaintiffs in their collective bargaining agreements do not necessarily limit Congress's authority via the Takings Clause:

"Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of the dominant constitutional power by making contracts about them."

If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.

*Connolly,* 475 U.S. at 223–224, 106 S.Ct. at 1025–1026 (citations omitted) (quoting *Norman v. Baltimore & Ohio R.R.,* 294 U.S. 240, 307–308, 55 S.Ct. 407, 415–416, 79 L.Ed. 885). The question is therefore limited to whether plaintiffs had reasonable expectations based on their contractual promises that they could not later be held liable for lifetime benefits. As we concluded above, their participation in the multi-employer plans would make any such expectation unreasonable.

Regarding the third and final factor—the character of the government action—we find the Coal Act indistinguishable from the MPPAA sustained in *Connolly* and *Concrete Pipe.* Like the Coal Act, the MPPAA does not permit the government to "physically invade or permanently appropriate any of the employer's assets for its own use." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. Rather, under the MPPAA the "interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and ... does not constitute a taking requiring Government compensation." *Id.* (citing *Penn Central, supra; Turner Elkhorn, supra*). Plaintiffs attempt to distinguish the MPPAA on the basis that the employers held liable under that Act were "responsible" for the financial difficulties caused by plan withdrawal, whereas no causal connection exists between plaintiffs' actions and the funding crisis remedied by the Coal Act. However, the argument ignores the role of employers in creating the

NBCWA funding crisis. When plaintiffs and other employers withdrew from the multi-employer plans, they left behind retired miners with legitimate expectations of lifetime benefits. As the number of employers continued to decline, the number of beneficiaries grew, and the result was a seriously underfunded health benefit program. Thus Congress passed the Coal Act, which, like the MPPAA, "adjusts the benefits and burdens of economic life to promote the common good...." *Id.*

■ In addition, plaintiffs' argument regarding their lack of responsibility goes beyond debate about the character of the government program, which we take from the language of *Connolly* to be an inquiry into the form or nature of interference with private property. The Coal Act entails no physical intrusion of plaintiffs' property nor any permanent confiscation of assets for government use. As the Supreme Court stated,

> It is well settled that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490 n. 18, 107 S.Ct. 1232, 1244 n. 18, 94 L.Ed.2d 472 (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659).

In conclusion, we find that all three of the *Connolly* factors demonstrate that the Coal Act does not unconstitutionally take property from plaintiffs without compensation.[12] When dealing with legislation adjusting the benefits and burdens of economic life that passes muster under the Due Process Clause, as the Coal Act does, "it would be surprising indeed to discover now" that Congress had nonetheless committed an unconstitutional taking. *Connolly*, 475 U.S. at 223, 106 S.Ct. at 1025. No surprises exist here.

## III.

The Coal Act was a rational solution to a serious health benefit problem that threatened the stability of the bituminous coal industry in the United States. Requiring plaintiffs to participate in the solution because they once benefitted from the labor of coal industry retirees and once participated in collective bargaining agreements that fostered a legitimate expectation of lifetime health benefits was also a rational legislative decision. This Court does not sit in judgment on the wisdom of Congress's solution, only its rationality. *Turner Elkhorn*, 428 U.S. at 18–19, 96 S.Ct. at 2893–2894. Moreover, the existence of a proportional financing scheme, the lack of any reasonable expectation that plaintiffs would not be liable under the Coal Act, and the economic character of the Act, which only readjusts the benefits and burdens of economic life, preclude us from finding an unconstitutional taking. The district court properly entered summary judgement against plaintiffs, and its decision is therefore affirmed.

---

**12.** We are thus in agreement with all but one federal court to have decided the issue. See *Chateaugay, supra; Barrick Gold, supra; Blue* *Diamond, supra; Lindsey Coal, supra.* But see *Unity Real Estate Co. v. Hudson*, 889 F.Supp. 818 (W.D.Pa.1995) (finding unconstitutional taking).